UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
(NASHVILLE DIVISION)

| | |
|---|---|
| **CHOOSING JUSTICE INITIATIVE & CAROL DAWN DEANER,** *Plaintiffs,* **v.** **BOARD OF PROFESSIONAL RESPONSIBILITY OF THE SUPREME COURT OF TENNESEE, and JUDGE CHERYL A. BLACKBURN, in her judicial capacity,** *Defendants.* | Case No. _____ |

**COMPLAINT**

## Introduction

1.  Hundreds of people are currently locked in the Davidson County Jail awaiting trial on criminal charges because they are too poor to pay money bail. Many are represented by attorneys who were chosen by the judges before whom their cases are pending. Because of how they are selected and compensated, those attorneys may have little incentive to work zealously for their clients and may instead be more interested in pleasing the judges. Sometimes these lawyers leave their clients in the jail for months, or even years, without seeking to secure their pretrial release, filing any other motions on their behalf, or conducting any factual investigation of their case. During that time, some lawyers have little contact with their clients, leaving them desperate for help and information.

2.  After more than ten years as Nashville's elected public defender, Carol Dawn Deaner left the public defender's office to open the Choosing Justice Initiative ("C.J.I."), a non-profit dedicated to ending wealth-based disparities in Nashville's criminal legal system. One of C.J.I's goals was improving the quality of indigent-defense representation in Tennessee by changing how attorneys are appointed to represent poor people. To do this, C.J.I. sought to develop a process by which people who depend on court-appointed counsel could choose their defense lawyer, like people who can afford to hire counsel do, instead of having to accept a lawyer chosen for them by the judge hearing their case.

3.  When word spread about C.J.I.'s work, people who already had court-appointed lawyers with whom they were unsatisfied with began contacting C.J.I. to request help. Among other things, they complained about their court-appointed lawyers rarely

2

visiting them, not responding to their phone calls, refusing to file motions for them (including motions for pretrial release), not providing them with copies of documents, conducting no investigation, and generally failing to advocate for them.

4. These complaints were familiar to Deaner, who fielded hundreds of similar calls from people represented by court-appointed lawyers during her time as Nashville's Public Defender. Based on her experience, Deaner knew that Tennessee's indigent-defense system makes it nearly impossible for a poor person facing trial with an ineffective court-appointed lawyer to obtain a new lawyer who will provide constitutionally adequate and effective representation consistent with the requirements of the Sixth Amendment without outside help.

5. Faced with requests for help from people experiencing the very problem Deaner started C.J.I. to address, she agreed that C.J.I. could and would assist them with seeking substitute appointed counsel who would provide effective representation.

6. In pursuing this goal, Deaner found herself before Defendant Judge Cheryl Blackburn, who expressed that she "disagrees with" Deaner's criticisms of the appointed-counsel system and her approach to assisting indigent criminal defendants in securing their Sixth Amendment right to effective representation. When Deaner appeared in Judge Blackburn's court on behalf of a client seeking substitute appointed counsel, Judge Blackburn ordered Deaner, on pain of contempt, not to speak to that client, or to any prospective clients with cases pending in her court, without first obtaining the permission of their current attorneys of record.

3

7.    Judge Blackburn also complained about Deaner's actions to the Board of Professional Responsibility of the Supreme Court of Tennessee ("the Board"). Months after Blackburn wrote to them, the Board sent Deaner a letter indicating that it believes Deaner's conduct violates the Tennessee Rules of Professional Conduct, with the implication that she will face future professional discipline if she engages in similar conduct again (but not yet instituting formal disciplinary proceedings).

8.    Judge Blackburn's orders and the Board's threat of future disciplinary action violate Deaner's First Amendment rights. She and C.J.I. bring this case seeking a declaration that they may continue their work without further interference from Judge Blackburn, and an injunction that they may do so without suffering disciplinary sanction by the Board.

**Parties**

9.    The Choosing Justice Initiative is a non-profit corporation formed under Tennessee law.

10.    Plaintiff Carol Dawn Deaner is President and Executive Director of C.J.I.

11.    Defendant Judge Cheryl A. Blackburn is a judge of the Davidson County Criminal Court. She is sued in her judicial capacity for a declaratory judgment only.

12.    Defendant Board of Professional Responsibility of the Supreme Court of Tennessee is the agency responsible for governing the legal profession in Tennessee and for enforcing Tennessee's Rules of Professional Conduct. The Board is sued for an injunction.

4

## Jurisdiction

13.     Deaner brings this action pursuant under 42 U.S.C. § 1983 and the United States Constitution.

14.     This Court has jurisdiction under 28 U.S.C. § 1331.

## The Appointed-Counsel System in Nashville

15.     Under Tennessee Supreme Court Rule 13, people charged with crimes in Tennessee who are unable to afford an attorney will be represented by an attorney chosen by the judge before whom the case is pending.

16.     Rule 13 imposes few restraints on a judge's ability to choose any attorney she pleases. Although the rule requires that "the court shall appoint the district public defender's office"—in this case the Nashville Public Defender office—so long as that office is "qualified pursuant to this rule and no conflict of interest exists," the judge may nonetheless appoint someone else if "in the sound discretion of the trial judge appointment of other counsel is necessary."

17.     Under the rule, each judge must maintain her own "roster" of attorneys eligible for individual appointments, but the judge still may choose "attorneys whose names are not on the roster if necessary to obtain competent counsel . . . ." Whenever a defendant is deemed eligible for appointed counsel and the judge presiding decides not to appoint the public defender's office, the judge chooses the individual attorney to represent the defendant from the roster (or otherwise) by whatever means the judge prefers; there is no

5

requirement that appointments be distributed evenly, or even randomly. Many judges appoint attorneys who happen to be sitting in the courtroom.

18.     Private attorneys appointed to all but capital murder cases are paid an hourly rate of $50 for the time they spend working on a case. Additionally, their total compensation per case is effectively capped at amounts that are far below market rates.

19.     Two core problems with this system are well documented. First, because of the presumptive cap on compensable hours and the low hourly fee, attorneys have a financial incentive to open and close a high volume of cases but not to work more hours on a case than the payment caps allow. Second, because they depend upon the judges before whom they practice for appointments, attorneys may feel pressure not to file motions or engage in aggressive advocacy that may annoy or challenge the judge and cause the judge to stop appointing them to cases.

20.     As a result, defendants represented by appointed counsel selected by judges on average experience worse case outcomes than those represented by institutionally employed public defenders.

21.     In Nashville, for the years 2016, 2017, and 2018, defendants who were incarcerated pretrial and represented by appointed counsel selected by judges spent nearly twice as long in jail waiting for their cases to resolve as defendants represented by the public defender's office.

## The Choosing Justice Initiative

6

22. In 2018, Deaner founded C.J.I., a non-profit, public-interest organization working to end wealth-based disparities in Nashville's criminal legal system through education, advocacy, and direct legal representation.

23. One of the most significant wealth-based disparities that exists in Nashville's criminal legal system is in the quality of legal representation one receives. Wealthy people can purchase the best representation money can buy, while poor people get a lawyer appointed by the court. Deaner founded C.J.I. in large part to improve access to effective criminal-defense representation for people in Nashville who qualify for court-appointed counsel.

24. One of C.J.I.'s first projects was the Choice Lawyer Project (C.L.P.). C.L.P. was designed to offer people who qualify for court-appointed counsel the opportunity to select their court-appointed lawyer.

25. C.L.P.'s success depended upon C.J.I. recruiting participation from lawyers willing to accept appointments under its choice-of-counsel model. Lawyers also had to commit to provide high quality, client-centered representation. C.J.I. defines high-quality practice as meeting practice standards consistent with effective, constitutional representation. It defines client-centered representation as placing the client at the center of the representation; educating him or her about all the options, strategies, and outcomes available to him or her; respecting that he or she is the most qualified to decide the goals of the representation; and zealously pursuing the client's stated goals, so long as they are legal, even when the lawyer has counselled a different course of action.

7

## Deaner is Retained by Ricky House Who Had Not Heard from His Court-Appointed Lawyer in Months

26. In September, 2019, C.J.I. received a letter from Ricky House, who was incarcerated in the Davidson County Jail, and whose cases were pending in Judge Blackburn's court.

27. House requested C.J.I.'s help with problems he was having with his appointed attorney and suggested that he needed better representation.

28. This letter was the first contact C.J.I. or Deaner had with House.

29. After reviewing publicly available documents about House's case, Deaner asked Erica Duggan, a non-attorney C.J.I. employee, to go meet with House and learn more about his situation.

30. At the time, Deaner did not represent anyone connected with House's case.

31. After Duggan met with House, Duggan reported back to Deaner that House had serious concerns with his appointed attorney. Based on what she learned, Deaner believed House's Sixth Amendment right to effective representation was being violated.

32. On October 23, 2019, Deaner met with House at the jail to discuss his request for C.J.I.'s assistance.

33. At the conclusion of that meeting, Deaner (on behalf of C.J.I.) and House executed a limited-scope representation agreement authorizing C.J.I. counsel to represent House on a motion to appoint substitute counsel in his criminal cases. The agreement stated that C.J.I.'s representation on the motion to substitute was to be provided free of charge.

## Deaner Moves to Substitute House's Attorney

34.     On October 31, 2019, Deaner filed a Request to Enter Limited Notice of Appearance and a Motion for Appointment of Substitute Counsel in House's criminal cases.

35.     On November 13, 2019, Deaner appeared in Judge Blackburn's court for a hearing on House's motion.

36.     When Judge Blackburn took the bench, she directed her court officer not to bring House into the courtroom for the hearing "[because Deaner] doesn't represent anybody."

37.     Judge Blackburn then conducted a hearing on Deaner's Request to make a limited appearance in House's cases. During the hearing she questioned Deaner's "standing" to file such a motion, and inquired if Deaner had contacted House's appointed attorney before she communicated with him.

38.     Deaner explained that she had not contacted House's appointed lawyer before communicating with House because the Rules of Professional Conduct did not require her to do so, nor did they prohibit her from communicating with House.

39.     After a contentious hearing that lasted roughly 20 minutes, Judge Blackburn orally denied Deaner's motion to enter a limited appearance. She also refused to conduct a hearing on the Motion for Substitute Appointed Counsel Deaner had filed on House's

9

behalf. In doing so, Judge Blackburn stated that she had not yet ruled on a *pro se* oral request House had made at his last court appearance "to represent himself."[1]

**Judge Blackburn Silences Deaner Through a Prior Restraint on Her Speech**

40. Before excusing Deaner from court, Judge Blackburn issued an additional order from the bench, this one directed at Deaner.

41. "[D]o not talk to any defendant in this court unless you get permission from the attorney," Judge Blackburn said. "I don't care for what. Just do not do it . . . . [That is] my order. You do not talk to anyone who is represented by counsel without that attorney knowing you're doing it."

42. Convinced that her conduct was permitted by the Rules of Professional Conduct, Deaner asked Judge Blackburn to provide reasoning justifying that order. Judge Blackburn did not provide anything specific that day.

43. On November 25, 2019, Judge Blackburn issued an order styled formally as a denial of Deaner's request to enter a limited notice of appearance in House's cases. In the order's conclusion, Judge Blackburn reiterated her order that Deaner not "talk to any represented criminal defendant in this Court unless she obtains permission from their current counsel as required by RPC 4.2."

44. The order explicitly noted as a ground for taking action against Deaner that "[t]his Court disagrees with [the suggestion that] attorneys appointed by the court are 'more

---

[1] House moved to represent himself only because Judge Blackburn had denied his pro se, oral motion for a new lawyer.

concerned about keeping the judge happy, instead of their clients' . . . as well as the suggestions attorneys appointed by the court 'have little incentive to work hard for their clients.'"

45.     Because Judge Blackburn's order is not a final judgment, and because Deaner was explicitly forbidden to appear in House's case, Deaner had no way to appeal Judge Blackburn's order.

46.     Shortly after filing the order, Judge Blackburn filed a referral against Deaner with the Board.

### The Board Indicates that it Interprets Rule 4.2 to Cover C.J.I.'s and Deaner's Conduct, But Does not Yet Institute Formal Disciplinary Proceedings

47.     On December 4, 2019, Deaner received a letter from the Board stating that Judge Blackburn had filed a complaint regarding her conduct.

48.     On December 17, 2019, Deaner received a letter from the Board stating that a similar complaint had been filed by two attorneys, one of whom was House's original appointed attorney.

49.     Both complaints alleged that Deaner, inter alia, violated Tennessee Rule of Professional Conduct 4.2, which reads: "*In representing a client*, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."

50.     On January 9, 2020, Deaner responded to the complaints. She argued, inter alia, that she did not violate R.P.C. 4.2 because when she communicated with House she

11

was not representing any other party. Citing extensive authority, Deaner explained that R.P.C. 4.2 does not forbid attorneys to communicate with prospective clients who are currently represented by attorneys; the Rule's purpose is instead to protect represented parties from overreaching *by lawyers representing other parties in the same matter.*

51. On July 10, 2020, the Board sent Deaner a letter stating that "while acting on behalf of C.L.P.[2], [she] communicated with a represented criminal defendant without the permission of his counsel in violation of RPC 4.2."

52. The Board offered Deaner "diversion" of the complaints, which would result in no formal disciplinary charges being filed—they had not, and have not, yet been filed— if she agreed to take three hours of continuing legal education.

53. In its letter, the Board wrote that its offer of diversion was made "in hopes that resolution in this matter will cause [Deaner] to avoid such violations in the future."

54. Because Deaner firmly believes that her actions did not constitute professional misconduct, and because she intends to engage in similar conduct in the future if not forbidden to do so, Deaner refused to accept diversion.

55. By letter dated August 11, 2020, Deaner explained that her conduct does not violate R.P.C. 4.2, and that R.P.C. 4.2 protects the right of every person in need of legal representation to seek and obtain freely the advice of other disinterested attorneys. Further, Deaner stated that if R.P.C. 4.2 is interpreted to bar her conduct, it is unconstitutional as applied to her and to any lawyer who engages in similar conduct.

---

[2] The Board probably meant "C.J.I." C.L.P. is a project of C.J.I., not an independent entity.

56. The Board has not filed formal disciplinary charges against Deaner.

57. Because the Board has not filed formal disciplinary charges against Deaner, there is no forum in the disciplinary system in which Deaner could raise any arguments against enforcing R.P.C. 4.2 against her.

58. The disciplinary system does not provide any forum for Deaner to secure constitutional protection against future enforcement of R.P.C. 4.2 against her.

59. No other C.J.I. attorney has been the subject of a disciplinary complaint relating to contacting people represented by appointed counsel.

## Deaner and Other C.J.I. Lawyers Are Unable to Respond to Inquiries from Prospective Clients in Jail

60. Since November 13, 2019, C.J.I. has received two inquiries from people whose cases are pending in Judge Blackburn's court who have appointed counsel with whom they are dissatisfied. An additional fourteen people with cases in other courtrooms in Davidson County have contacted C.J.I. for the same reason.

61. Deaner has not responded to these people, and has not sought to communicate with anyone else detained at the jail, only out of concern for possible contempt sanctions for violating Judge Blackburn's order and potential disciplinary action by the Board.

62. C.J.I.'s other employees, both lawyer and non-lawyer, have not communicated with anyone who is currently represented by appointed counsel because the attorneys fear disciplinary sanction if they or anyone acting on their behalf communicates with someone who is represented by counsel.

63. As a result, C.J.I. and Deaner are unable to pursue one of their foundational goals: helping people who cannot afford to hire a lawyer effectuate their constitutional right to effective representation.

64. Deaner intends to communicate in the future with people represented by appointed counsel if she is not barred by Judge Blackburn's order and threatened with disciplinary action.

65. C.J.I. intends to direct the lawyers in its employ to communicate in the future with people represented by counsel if those lawyers would not be subject to professional discipline for doing so.

66. House is still in jail pretrial. Neither Deaner nor anyone else at C.J.I. has communicated with him since November 13, 2019. He has been in a cage for more than two years without a criminal conviction because he cannot afford to pay the sum of money the court set for his bail.

## Claims for Relief

**Count One: Judge Blackburn's Order Preventing Deaner From Speaking to Prospective Clients For Non-Pecuniary Reasons Without the Permission of Counsel Is a Prior Restraint That Violates Deaner's First Amendment Rights**

(Against Judge Blackburn Only)

67. Deaner incorporates paragraphs 1–66 of this Complaint as though fully set out here.

68. The First Amendment to the United States Constitution protects the rights of attorneys to speak to and associate with prospective clients in person for purposes other

14

than the attorneys' pecuniary gain, particularly when attorneys are seeking to advance political and social-justice causes.

69. Judge Blackburn's order that Deaner not communicate with prospective clients without the advance permission of their appointed attorneys constitutes a prior restraint on Deaner's and C.J.I.'s protected speech and association.

**Count Two: The Board's Threatened Enforcement of the Tennessee Rules of Professional Conduct Against Deaner and C.J.I. Violates Their First Amendment Rights**

(Against the Board Only)

70. Deaner incorporates paragraphs 1–66 of this Complaint as though fully set out here.

71. The First Amendment to the United States Constitution protects the rights of attorneys to speak to and associate with prospective clients in person for purposes other than the attorneys' pecuniary gain, particularly when attorneys are seeking to advance political and social-justice causes.

72. The Board has indicated that it interprets R.P.C. 4.2 to forbid attorneys who are not representing any other party in a matter to communicate with prospective clients who are represented by counsel without the permission of their current attorney. The Board's interpretation does not make any exceptions for communications initiated by a lawyer for purposes other than pecuniary gain.

73. The Board's interpretation of R.P.C. 4.2 violates Deaner's and C.J.I.'s First Amendment rights.

15

## Request for Relief

WHEREFORE, Deaner requests:

- A declaratory judgment that Judge Blackburn's order that Deaner not communicate with represented parties for any reason is an unconstitutional prior restraint on her speech;
- An injunction against the Board forbidding it to enforce R.P.C. 4.2 against Deaner or any other C.J.I. attorney if they communicate with represented parties in the future for purposes of representing them pro bono;
- An award of reasonable attorneys' fees against the Board under 42 U.S.C. § 1988; and
- Any other relief this Court considers just and proper.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein†
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, DC 20009
charlie@civilrightscorps.org
(202) 894-6128

*/s/ Seth Wayne*
Seth Wayne *
Nicolas Y. Riley *
Institute for Constitutional Advocacy & Protection
Georgetown University Law Center
600 New Jersey Avenue N.W.
Washington, DC 20001
jb2845@georgetown.edu
nr537@georgetown.edu
(202) 662-4048

† *Motion to proceed without local counsel forthcoming*
* *Pro hac vice motions forthcoming.*

16